**Michelle T. Friend**
**Jared C. B. Frickle**
**HEDGER FRIEND, P.L.L.P.**
**2800 Central Avenue, Suite C**
**Billings, Montana  59102**
**(406) 896-4100**
**(406) 896-4199 - facsimile**
**mfriend@hedgerlaw.com**
**jfrickle@hedgerlaw.com**

**Attorneys for BNSF Railway Company**


## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | | |
|---|---|---|
| **JOSHUA F. COTTON,** | ) | **Case No. 4:17-cv-00125-BMM** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **BNSF'S  BRIEF IN SUPPORT OF** |
| **vs.** | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT** |
| **BNSF RAILWAY COMPANY,** | ) | |
| **a Delaware corporation,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

[This page left blank]

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................3

I.  BACKGROUND...........................................................................................6

II.  LEGAL STANDARD ................................................................................11

III.  ARGUMENT...............................................................................................12

   A.  PLAINTIFF'S NEGLIGENT MISMANAGEMENT CLAIM MUST BE
      DISMISSED. ...........................................................................................12

      1.  Plaintiff's claims are preempted by the federal Railway Labor Act........14

      2.  Cotton lacks the requisite and necessary expert testimony to establish the
          foundation for his claim, warranting summary judgment........................22

      3.  Cotton has no facts or evidence to support his negligent mismanagement
          claim or his request for punitive damages. ..............................................27

IV.  CONCLUSION ...........................................................................................30

CERTIFICATE OF COMPLIANCE.......................................................................31

CERTIFICATE OF SERVICE ...............................................................................31

## TABLE OF AUTHORITIES

**Cases**

*Alaska Airlines, Inc. v. Schurke*,
    898 F.3d 904(9th Cir. 2018) ................................................. 14, 15, 16

*Allis-Chalmers v. Lueck*,
    471 U.S. 202 (1985) ........................................................15

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ........................................................12

*Andrews v. Louisville & N. R.R.*,
    406 U.S. 320(1972) ...................................................... 14, 15

*Association of Flight Attendants v. Horizon Air Indus.*,
    280 F.3d 901(9th Cir. 2001) ...............................................15

*Bielicke v. Terminal R.R. Ass'n*,
    30 F.3d 877 (7th Cir. 1994) .......................................... 18, 19

*Burnside v. Kiewit Pacific Corp.*,
    491 F.3d 1053 (9th Cir. 2007) ..............................................16

*Caterpillar v. Williams*,
    482 U.S. 386 (1987) ........................................................16

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ........................................................11

*Cramer v. Consolidated Freightways*,
    255 F.3d 683 (9th Cir. 2001) ...............................................16

*Culp v. Union Pacific RR Co.*,
    200 F. Supp. 2d 1099 (E.D. Mo. 2001) ......................................19

*Dalton v. Kalispell Reg'l. Hosp.*,
    256 Mont. 243, 846 P.2d 960 (1993) ........................................23

*Dayberry v. City of E. Helena*,
    2003 MT 321, 318 Mont. 301, 80 P.3d 1218 ..................................24

*Dean v. Norfolk So. Ry. Co.*,
    2015 U.S. Dist. LEXIS 39309 (S.D. Ohio Mar. 27, 2015) .....................19

*Dubiel v. Mont. DOT*,
    2012 MT 35, 364 Mont. 175, 272 P.3d 66 ................................ passim

*Dulaney v. State Farm Fire & Cas. Ins. Co.*,
    2014 MT 127, 375 Mont. 117, 324 P.3d 1211 ..................................24

*Fauerso v. Maronick Const. Co.*,
661 P.2d 20, 40 St. Rep. 327 (Mont. 1983).........................................30

*General Ins. Co. of America v. Town Pump, Inc.*,
214 Mont. 27, 692 P.2d 427 (1984) ..................................30

*Hagen v. Dow Chemical Co.*,
261 Mont. 487, 863 P.2d 413 (1993) ................................29

*Haux v. Mont. Rail Link, Inc.*,
2004 MT 233, 322 Mont. 456, 97 P.3d 540 ................................ 13, 22

*Hawaiian Airlines v. Norris*,
512 U.S. 246(1994) ................................ 14, 15, 16

*In re Barboza*,
545 F.3d 702 (9th Cir. 2008) ........................12

*Int'l Bhd. Of Elec. Workers v. Hechler*,
481 U.S. 851 ........................16

*Lewy v. Southern Pac. Transp.*,
799 F.2d 1281(9th Cir. 1986) ........................15

*Lingle v. Norge Div. of Magic Chef*,
486 U.S. 399 (1988) ........................15

*Magnuson v. Burlington Northern, Inc.*,
576 F.2d 1367 (9th Cir. 1978)........................18

*Medical Lab. Mgmt. Consultants v. American Broadcasting Companies, Inc.*,
306 F.3d 806 (9th Cir. 2002) ........................23

*Not Afraid v. State*,
2015 MT 330, 381 Mont. 454, 362 P.3d 71 ................................ 23, 24

*O'Bagy v. First Interstate Bank of Missoula*,
241 Mont. 44, 785 P.2d 190 (1990) ........................29

*Owens v. Parker Drilling Co.*,
207 Mont. 446, 676 P.2d 162 (1984) ........................29

*Peterson v. Eichhorn*,
2008 MT 250, 344 Mont. 540, 189 P.3d 615 ........................23

*Wilderness Dev., LLC v. Hash*,
606 F.Supp.2d 1275 (D. Mont. Mar. 9, 2009)........................23

*Wolfe v. BNSF Ry. Co.*,
749 F.3d 859 (9th Cir. 2014) ........................ passim

*Wolfe v. BNSF*,
    2011 U.S. Dist. LEXIS 86495 (U.S. Dist. Mont. Aug. 29, 2011).....................17

**Statutes**

§ 27-1-221, MCA ...........................................................................................29

§ 39-2-703(1), MCA ................................................................................. passim

45 U.S.C. §151a ...........................................................................................14

**Rules**

Rule 26, F.R.Civ.P. ............................................................................... 28, 29

Rule 33, F.R.Civ.P. ......................................................................................28

Rule 34, F.R.Civ.P. ......................................................................................28

Rule 56, F.R.Civ.P. ......................................................................................12

BNSF Railway Company ("BNSF") respectfully submits the following Brief in Support of its Motion for Summary Judgment. Following a formal investigation into his misconduct, Plaintiff Joshua Cotton was dismissed from employment with BNSF. He has now alleged that BNSF committed negligent mismanagement relating to his termination. For the reasons set forth herein, the Court should grant judgment in BNSF's favor and dismiss Plaintiff's claims with prejudice.

## I.      BACKGROUND

At all times relevant, Plaintiff Joshua Cotton ("Cotton") was employed as a laborer at BNSF's Roundhouse facility in Great Falls, Montana. SUF 1. His employment, the disciplinary process, and any discipline assessed during his employment was governed by a Collective Bargaining Agreement ("CBA") between his union and BNSF. SUF 34. On November 4, 2014, prior to the events at issue in this lawsuit, Cotton was assessed a Level S[1] 30-day record suspension with a one-year review period after he admitted violations of BNSF Safety Rules when he failed to apply a sufficient number of handbrakes to prevent the undesired movement of a locomotive. SUF 2. At that time, Cotton was advised that any rules violation during the one-year review period could result in further disciplinary action. *Id*.

Prior to the events leading to this lawsuit, a fixed, permanently mounted safety mirror had been installed in the Roundhouse at the request of BNSF

---

[1] Level S violations indicate a serious offense. SUF 38.

employees in response to a fatal workplace shooting that had occurred in Klamath

Falls, Oregon. SUF 3, 7. The safety mirror is mounted in a specific fixed position

and is not intended to be moved. SUF 3, 6.



Following the installation of the safety mirror, BNSF had received

complaints that unknown employees had been moving the mirror, at one point had

ripped the mirror down, and had rubbed some form of mucus on it. *See* Depo. of

Robert Tucker, 23:6-22; 24:7-21 (Dec. 19, 2018)[2]. As a result, on March 2, 2015,

Cotton and other employees attended a safety briefing that addressed the placement

of the safety mirror and instructed that the mirror was not to be moved. SUF 4.

---

[2] References to statements and/or facts other than those identified in the Statement of Undisputed
Facts are attached hereto and are provided herein for background, clarification, and context and
as such are not viewed as material to, nor dispositive of, the legal analysis in this Motion for
Summary Judgment.

Then again, on March 17, 2015, Cotton was briefed and trained on Mechanical Safety Rule S-28.22, which prohibits employees from altering, nullifying, changing the design of, or interfering with the normal function of any device or equipment on railroad property, which included the safety mirror. SUF 5. The purpose of the March, 2015 employee meetings was to reiterate that the safety mirror was there at the request of employees to increase safety and visibility in the office area and that it was not to be moved. SUF 6, 7.

On October 9, 2015, Cotton worked the first shift of the day. SUF 8. When the second-shift employees arrived at work that day, they noticed that the safety mirror above the safety briefing sign-in sheet had been moved. SUF 9. The second-shift employees also noticed the turnover map was incorrect as it indicated two sets of locomotives were ready to be moved – however the locomotives were in fact still locked and under blue flag protection. SUF 10. Blue flag or blue signal protection signifies that workmen are on, under, or between rolling equipment SUF 11. Blue flags are a safety device and may only be removed by the craft or group who placed them. SUF 12. The employees reported their findings to Mechanical Foreman Mike Palmer, who forwarded the findings to General Foreman Robert Tucker ("Tucker"). SUF 13.

That evening Tucker travelled to the Roundhouse and spoke to two second-shift employees. *See* CBA Investigative Hearing Exhibit 11 (Tucker Email, Oct. 11, 2015); Investigative Hearing Transcript (Testimony of Robert Tucker) 25:5-14

(Oct. 19, 2015). While at the Roundhouse, Tucker noticed an article about narcissistic behavior posted on Cotton's locker. SUF 14. The following day, October 10, 2015, Tucker spoke with Cotton and his co-worker Joe Copenhaver. SUF 15. Copenhaver denied moving the safety mirror and denied seeing Cotton adjust it either. *See* Depo. of Robert Tucker, 47:8-15 (Dec. 19, 2018). Copenhaver further reported that he had removed his blue signal protection from the locomotives the day before. *See* Investigative Hearing Transcript (Testimony of Joe Copenhaver) 80:7-15 (Oct. 19, 2015).

Thereafter, Tucker spoke to Cotton, and Cotton repeatedly denied touching or moving the safety mirror. SUF 16. However, upon further questioning, Cotton replied, "If I do tell you that, yes, I did move the mirror, then what? Are you going to investigate me over a stupid mirror?" SUF 17. Cotton then admitted to Tucker that he had moved the safety mirror and that he thought it was "stupid" to have the mirrors in the first place. SUF 18. Cotton further stated that he did not understand why safety mirrors were needed and that he did not see what the "big deal" was that he moved it. SUF 19.

Tucker also questioned Cotton about removing the blue signal protection. SUF 20. Cotton informed Tucker that the locomotive had in fact been left locked and flagged, but that he did not know why. *See* CBA Investigative Hearing Exhibit 11 (Tucker Email, Oct. 11, 2015); Investigative Hearing Transcript (Testimony of Robert Tucker), 27:5-8 (Oct. 19, 2015). Cotton again stated he did not understand

what the "big deal" was when the second shift was incorrectly informed that the locomotives were ready to go. *See* CBA Investigative Hearing Exhibit 11 (Tucker Email, Oct. 11, 2015); Investigative Hearing Transcript (Testimony of Robert Tucker), 27:8-26 (Oct. 19, 2015). When questioned about the article on his locker, Cotton stated he had taped it there. SUF 21. Tucker informed Cotton that that type of behavior was harassing and offensive to his coworkers and that he should remove the article, which he did. SUF 22. All of this occurred while Cotton was still within his one-year review period from his prior discipline from November 4, 2014. SUF 24.

On October 12, 2015, Cotton was served a notice of investigation pursuant to the applicable CBA[3], advising that a formal investigation had been scheduled for October 19, 2015, in order to determine his responsibility, if any, for the alleged misconduct and any potential rules violations that occurred at the Roundhouse on October 9, 2015. SUF 25. Cotton was withheld from service pending results of the investigation. SUF 26.

On October 19, a formal investigation pursuant to the CBA was held. SUF 27. After the formal investigative hearing, during which Cotton was represented by his union representative and allowed to present evidence, BNSF determined based on the testimony and exhibits that Cotton had violated MSR 28.6 Conduct and

---

[3] Rule 28(a) of the CBA governs investigations and states "[a]n employee [. . .] will not be disciplined or dismissed until after a fair and impartial investigation has been held [. . .]." SUF 28.

MSR 24.2 Blue Signal Protect of Workmen. SUF 29, 33. Because he was still on review from his prior Level S offense, Cotton was subject to dismissal in accordance with the BNSF Policy for Employee Performance and Accountability ("PEPA"). SUF 31. Accordingly, Cotton was dismissed on November 2, 2015. SUF 33, 34.

Cotton appealed his dismissal pursuant to his CBA and the Railway Labor Act ("RLA"). SUF 35. In January 2018, the Public Law Board upheld his dismissal in Public Law Board No. 7501, Case No. 88, concluding that through his own actions, Cotton had "dealt a fatal blow to the confidence that is so critical to every successful employer-employee relationship" and that his own "deliberate, purposeful decision to tamper with a safety device [the safety mirror] even after instructions not to and his violation of important blue signal safety rules were both offensive to highly important safety rules." SUF 36, 37. In affirming BNSF's decision to terminate Cotton, the PLB further concluded that Cotton's misconduct did not warrant leniency, that the discipline imposed was not arbitrary or capricious, and that his claim must be denied. SUF 38. The Public Law Board's decision is final and binding. SUF 39.

## II.   LEGAL STANDARD

The purpose of summary judgment is to terminate claims and defenses that are factually unsupported. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986). Summary Judgment is proper when "the pleadings, the discovery and disclosure

11

materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party and a dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The party moving for summary judgment has the initial burden of showing that absence of a genuine issue of material fact. *Id.,* at 256-257. Once the moving party has done so, the burden shifts to the opposing party to set forth specific facts showing there is a genuine issue for trial. *In re Barboza,* 545 F.3d 702, 707 (9th Cir. 2008). The nonmoving party "may not rely on denials in the pleadings, but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Id.*

## III.   ARGUMENT

## A.   PLAINTIFF'S NEGLIGENT MISMANAGEMENT CLAIM MUST BE DISMISSED.

Cotton alleges a statutory "negligent mismanagement" claim under § 39-2-703(1), MCA, which states, in pertinent part:

> A [. . .] corporation operating a railway or railroad in this state is liable for all damages sustained by any employee of the [. . .] corporation in consequence of the neglect of any other employee of the [. . .] corporation or by the mismanagement of any other employee and in consequence of the willful wrongs, whether of commission or omission, of any other employee of the [. . .] corporation when the

neglect, mismanagement, or wrongs are in any manner connected with the use and operation of a railway or railroad on or about which the employee is employed

*Id*. See also *Haux v. Mont. Rail Link, Inc.,* 2004 MT 233, ¶ 16, 322 Mont. 456, 97 P.3d 540. The allegations of negligent mismanagement in Cotton's Complaint can be broken down into three categories: 1) mismanagement in the collection and presentation of evidence and testimony during the formal investigative hearing, up to and including the discipline assessed to Cotton, 2) mismanagement for not "adequately" supervising Cotton and his coworker during their shift on October 9, 2015; and 3) mismanagement for not making a single employee responsible for job site turnover and certification of the removal of blue signal protection. Cmplt., p. 7, (ECF 3).

Cotton clarified his claims against BNSF at his deposition when he testified that BNSF committed negligent mismanagement during the formal investigation into his misconduct by: 1) "ignor[ing] witness testimony concerning turnover," 2) "fail[ing] to thoroughly examine what was going on" with regard to the blue flag or blue signal violations he was accused of, and 3) "accus[ing] [him] of pointing the pieces of paper on [his] locker at specific people." Depo. Josh Cotton, 165:1 – 167:13 (September 21, 2018); SUF 41.

As set forth below, summary judgment is appropriate for a number of reasons. First and foremost, Cotton's negligent mismanagement claim is preempted by the federal Railway Labor Act. Second, and notwithstanding the preemption of

his claims, Cotton lacks the requisite expert to testify about the standard of conduct or care required by BNSF in order to establish his negligent mismanagement claim, which is fatal to his lawsuit. Lastly, Cotton admitted in discovery that any facts or evidence he might have to support his claim are privileged and thus undiscoverable and inadmissible, all of which warrants dismissal of his claim.

### 1.  Plaintiff's claims are preempted by the federal Railway Labor Act.

Preemption is a federal issue, to be determined by federal law, and the federal administrative remedy created by the Railway Labor Act (RLA) is exclusive. *Andrews v. Louisville & N. R.R.*, 406 U.S. 320, 325 (1972). The RLA establishes "a mandatory arbitral mechanism" for the "prompt and orderly settlement" of two classes of disputes: (1) major disputes; and (2) minor disputes. Major disputes relate to the formation or modification of the contractual rights provided for by collective bargaining agreements (CBAs), while minor disputes involve "interpretation or application of agreements covering rates of pay, rules, or working conditions." *Hawaiian Airlines v. Norris*, 512 U.S. 246, 252-53 (1994) (*citing* 45 U.S.C. §151a). "Minor disputes under the RLA – those disputes concerned with 'duties and rights created or defined by' the collective bargaining agreement 'must be resolved only through the RLA mechanisms.'" *Alaska Airlines, Inc. v. Schurke*, 898 F.3d 904, 919 (9th Cir. 2018)(internal citations omitted). Furthermore, "[t]o the extent state law would also create a cause of action for a minor dispute, and thereby 'permit an individual to sidestep available

grievance procedures,' the state law action is preempted." *Id*.

To ensure the uniform application and interpretation of CBAs, RLA preemption divests state and federal courts of subject-matter jurisdiction over minor disputes and requires that major disputes be pursued through explicit procedures as outlined in the RLA. *Association of Flight Attendants v. Horizon Air Indus.*, 280 F.3d 901, 904 (9th Cir. 2001); *Andrews*, 406 U.S. at 322; *Lewy v. Southern Pac. Transp.*, 799 F.2d 1281, 1289-92 (9th Cir. 1986).

The standard for RLA preemption of state-law claims that resemble minor disputes is identical to the standard under Section 301 of the Labor Management Relations Act ("LMRA"). *Hawaiian Airlines*, 512 U.S. at 246-47. Thus, if "resolution of a state-law claim depends on an interpretation of the CBA, the claim is preempted." *Id.* (*citing Lingle v. Norge Div. of Magic Chef*, 486 U.S. 399, 405-06 (1988)). RLA preemption is a fact-specific exercise that turns on the factual basis of a plaintiff's cause of action and the elements he must prove. See, *e.g., Lingle*, 486 U.S. at 407; *Allis-Chalmers v. Lueck*, 471 U.S. 202, 220 (1985). The guiding principle, in evaluating RLA preemption, is "if a state law claim 'is either grounded in the provisions of the labor contract or requires interpretation of it,' the dispute must be resolved through grievance and arbitration" and is therefore preempted. *Alaska Airlines*, 898 F.3d at 920.

The Ninth Circuit employs a two-part test for preemption, asking (1) whether the claim is founded on rights created by a CBA, and (2) even if the claim

is founded on independent state law, whether it is nevertheless "substantially dependent" on analysis of a CBA. See *Burnside v. Kiewit Pacific Corp.*, 491 F.3d 1053, 1059 (9th Cir. 2007). A claim is "substantially dependent" on interpretation if it would require resolution of a dispute over the meaning of CBA terms, as opposed to a mere need to consult or refer to the agreement. *Id.*, at 1060. State claims "founded directly on rights created by collective-bargaining agreements" are preempted. *Cramer v. Consolidated Freightways*, 255 F.3d 683, 689 (9th Cir. 2001) (*quoting Caterpillar v. Williams*, 482 U.S. 386, 394 (1987)).

The "crucial inquiry in determining whether a cause of action under state law is preempted by the RLA is whether the 'state-law' claim is dependent on the interpretation of a CBA.'" *Wolfe v. BNSF Ry. Co.*, 749 F.3d 859, 864 (9th Cir. 2014) (citing *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 262 (1994)). "If a claim arises entirely from a right or duty of the CBA – for example, a claim for violation of the labor agreement, whether sounding in contract or in tort – it is, in effect, a CBA dispute in state law garb and is preempted." *Alaska Airlines v. Schurke*, 898 F.3d 904, 921 (9th Cir. 2018) (internal citations omitted). Further, "when a duty of care owed to [an] employee derives solely from a CBA, the claim is preempted." *Wolfe*, 749 F.3d at 865 (citing *Int'l Bhd. Of Elec. Workers v. Hechler*, 481 U.S. 851, 860-862).

In *Wolfe*, the plaintiff stated two causes of action under § 39-2-703, MCA: "(1) that BNSF's mismanagement and the negligence of its employees caused the

train collision; and (2) that BNSF mismanaged the subsequent investigation and disciplinary proceedings." *Wolfe*, 749 F.3d at 863. In the underlying case, the district court noted that plaintiff "[took] issue with the investigation leading to his dismissal, including charges of 'mismanage[ment of] railroad operations [. . .],' 'faulty evidence, negligent investigation, extreme exaggerations, false testimony,' 'altered evidence, and other wrongdoing to dismiss an employee otherwise undeserving of such treatment.'" *Wolfe v. BNSF*, *11, 2011 U.S. Dist. LEXIS 86495 (U.S. Dist. Mont. Aug. 29, 2011). The district court determined that plaintiff's allegations that BNSF "negligently or willfully mismanaged its investigation" and that BNSF "negligently and/or willfully mismanaged the consequent termination of [p]laintiff" were minor disputes under the RLA. *Id.* Because the plaintiff's claims were minor disputes "tied to alleged abuses of the CBA's investigatory process and errors in the hearing procedures," the district court concluded that ruling on the claims would require an interpretation and application of the CBA and, as such, the claims were preempted and should be dismissed. *Id.* at *18-19.

On appeal, the plaintiff-employee in *Wolfe* recognized, and conceded, that his claims challenging BNSF's investigation and disciplinary proceedings, which were governed by the applicable CBA, were preempted by the RLA. *Wolfe*, 749 F.3d at 863. The Ninth Circuit affirmed the lower court's dismissal on preemption issues, stating, "[w]e **AFFIRM** the district court's ruling that Wolfe's claim

17

alleging injury caused by BNSF's misconduct in proceedings pursuant to the CBA is preempted, as Wolfe concedes." *Id.* at 869 (emphasis in original).

In *Magnuson v. Burlington Northern, Inc.*, 576 F.2d 1367, 1369 (9th Cir. 1978), the plaintiff alleged, in addition to a wrongful discharge claim, that the defendants abused the investigatory process and presented false and misleading evidence at hearing leading to his discharge.  In ruling the latter claims preempted by the RLA, the Ninth Circuit noted:

> Under Article 24 of the labor contract between Burlington and the American Train Dispatchers' Association, a train dispatcher cannot be disciplined "without proper investigation."  The Article also spells out the components of a proper investigation and a hearing, including prior notice to the employee, the right of the employee to representation and to the presence of witnesses at the hearing, and the right of internal appeals, following decision, through the railroad hierarchy to the Adjustment Board.  All of the alleged misfeasance of the railroad employees is thus "arguably" governed by the collective bargaining agreement or has a "not obviously insubstantial" relationship to the labor contract.  Under these circumstances, the controversy is a minor dispute within the exclusive province of the grievance mechanisms established by the R.L.A.

*Id.* And in *Bielicke v. Terminal R.R. Ass'n,* 30 F.3d 877 (7th Cir. 1994), plaintiffs claimed that the company abused its right under the CBA to conduct investigations and "unfairly and vindictively investigated" them when they filed injury claims under the FELA. *Id.*, at 877. The plaintiffs' claims constituted a "minor" dispute subject to RLA preemption because the sole inquiry was whether the company abused its investigatory powers:

> One can not determine whether [the railroad] conducted the

> investigations for legitimate purposes under the collective
> bargaining agreements or if they abused the investigation
> procedures allowed by the collective bargaining agreements (*e.g.*,
> by conducting impermissible investigations under the guise of
> policy) without focusing the case on the collective bargaining
> agreements themselves. As such the proper vehicle for pursuing the
> claim is the Railway Labor Act (RLA).

*Id.*, at 878; *see also Dean v. Norfolk So. Ry. Co.*, 2015 U.S. Dist. LEXIS 39309, at

*9 (S.D. Ohio Mar. 27, 2015) ("The conduct for which plaintiff was suspended,

and the related investigation and disciplinary process, is covered by Article 41 of

the CBA. Therefore, if plaintiff's claims are preempted by the RLA, this dispute is

properly characterized as a 'minor' dispute, and is subject to the RLA's arbitral

process."); *Culp v. Union Pacific RR Co.*, 200 F. Supp. 2d 1099, 1100 (E.D. Mo.

2001) (finding RLA preemption as to disciplinary investigations allegedly

conducted in bad faith to retaliate against the employees for filing accident reports

and to prevent them from furnishing factual information).

Here, Rule 28 of the governing CBA establishes the process and procedure

to be followed prior to an employee being disciplined, stating in pertinent part:

> (a) An employee in service more than 60 days will not be disciplined
> or dismissed until after a fair and impartial investigation has been
> held. [. . .].
>
> (b) In the case of an employee who may be held out of service in
> cases involving serious infraction of rules pending investigation, the
> investigation shall be held within ten days after date withheld from
> service. He will be notified at time held out of service of the reasons
> therefor.
>
> (c) At least five days advance written notice of the investigation shall

19

be given the employee and the appropriate local organization representative, in order that the employee may arrange for representation by a duly authorized representative and for presence of necessary witnesses he may desire. The notice must specify the charge for which investigation is being held. [. . .].

(d) A decision shall be rendered within 20 days following the investigation, and written notice of discipline will be given the employee, with copy to local organization's representative.

*     *     *

(g) If it is found that an employee has been unjustly disciplined or dismissed, such discipline shall be set aside and removed from the record. He shall be reinstated with his seniority rights unimpaired, and be compensated for wage loss, if any, suffered by him, resulting from such discipline or suspension, less any amount earned during such period the disciplinary action was in effect.

SUF 28. Upon inquiry into the nature and basis of his complaint against BNSF,

Cotton reiterated his grievance with the CBA process, testifying:

Q: [. . .] What are you claiming in your lawsuit that BNSF did wrong or unlawfully?

**A: One of the things is they ignored witness testimony concerning turnover.**

Q: Anything else?

**A: Well, with the blue flag, they failed to, I think, look at what was really going on.**

*     *     *

Q: Well, I mean what did BNSF do wrong in regard to that if – with the blue flag or the blue signal?

**A: I think they failed to thoroughly examine what was going on.**

Q: Like they didn't investigate it properly; is that what you're saying?

**A: Well, I'm just going to leave it at they failed to take a good look at the entire situation.**

Q: Insofar as the blue flag –

**A: Correct.**

Q: - being left?

**A: Correct.**

20

Q:      Anything else?

**A:      They accused me of pointing the pieces of paper on my
locker at specific people, which is not true.**

Q:      Was that during the, that investigative hearing, when people
were testifying about that?

**A:      Yes.**

Q:      Anything else?

**A:      Not that I can think of.**

Depo. Cotton, 165:1 – 166:13 (Sept. 21, 2018); SUF 30.

As Cotton's testimony highlights, the entirety of his claim stems from, and takes issue with, the application and interpretation of the governing CBA and the investigative process that it entails. Cotton's allegations of "negligent mismanagement" are based upon general and conclusory complaints and grievances about the CBA investigative process, the findings of that CBA investigation, and the ultimate outcome of the formal investigative hearing. As such, Cotton's claims fall squarely in line with those types of claims that the Ninth Circuit held are preempted in *Wolfe*.

Furthermore, Cotton's allegations are inextricably intertwined with whether BNSF held a proper investigation that complied with the process laid out in the CBA (indeed, how can you determine what a "fair and impartial" investigation constitutes under the CBA without referring to it?). There is simply no getting around the fact that the CBA must be interpreted in order to determine whether BNSF, as Cotton claims: "[n]egligently and/or willfully mismanage[ed] its railroad operations resulting in [Cotton's] improper and unlawful discharge [. . .];"

21

"[f]ail[ed] and refuse[ed] to consider and/or investigate other employees as potentially responsible for the rule violations of which [Cotton] was charged;" "[n]egligently and/or willfully permitt[ed] Tucker and/or its employees to knowingly disregard relevant knowledge as to [Cotton's] alleged responsibility for rule violations and providing false and misleading testimony related thereto;" and "[n]egligently and/or willfully mismanaging [Cotton's] disciplinary assessment and termination." Compl. 7 (ECF 3).

In light of the above, there is no part of Cotton's claim that does not require construing the CBA, and his state law allegations cannot be resolved without applying and interpreting provisions of the CBA[4]. Just as in *Wolfe*, Cotton's claims are preempted and must be dismissed.

**2.     Cotton lacks the requisite and necessary expert testimony to establish the foundation for his claim, warranting summary judgment.**

Montana's negligent mismanagement statute, § 39-2-703, MCA, titled "[l]iability of railway corporation for negligence of fellow servants" appears to apply the general axioms of a negligence claim to a plaintiff's burden of proof. The statute, cited and quoted in relevant part above, stands for the general proposition that a corporation operating a railroad in Montana is liable for all damages

---

[4] In the event Cotton alleges or attempts to argue that any portion of his claim pre-dates the CBA investigatory process and procedure and is thus not subject to RLA preemption, that too fails. Section 39-2-703, MCA "negligent mismanagement" claims are purely statutory and are subject to a two-year statute of limitations. *Haux, v. Mont. Rail Link, Inc.,* 2004 MT 233, ¶ 33, 322 Mont. 456, 97 P.3d 540. Any claim Cotton attempts to attach to an event that pre-dates the CBA investigation is statutorily time-barred, as his dismissal was based on events that occurred between October 9-10, 2015, and his lawsuit was filed October 12, 2017.

sustained by its employee that are caused by the neglect, mismanagement, or wrongs of a co-employee when the offending employee's neglect, mismanagement, or wrongs are connected with the operation of the corporation's railroad. *Id*.

With the foregoing in mind, in order to succeed on his negligence claim Cotton must prove four essential elements against BNSF: "'(1) the defendant owed the plaintiff a legal duty, (2) the defendant breached that duty, (3) the breach was the actual and proximate cause of an injury to the plaintiff, and (4) damages resulted.'" *Not Afraid v. State*, 2015 MT 330, ¶ 13, 381 Mont. 454, 362 P.3d 71 (citing *Peterson v. Eichhorn*, 2008 MT 250, ¶ 23, 344 Mont. 540, 189 P.3d 615).[5] However, "'[i]t is well established that if a plaintiff fails to offer proof of any one of the elements of a negligence claim, the negligence action fails and summary judgment in favor of the defendant is proper.'" *Id*. (citing *Dubiel v. Mont. DOT*, 2012 MT 35, ¶ 12, 364 Mont. 175, 272 P.3d 66). Importantly, "[t]o determine if a defendant breached a duty of care, a plaintiff must establish the standard of care by which to measure the defendant's actions; in other words, [he] must establish the degree of prudence, attention, and caution the defendant must exercise in fulfilling that duty of care." *Dubiel*, ¶ 14 (citing *Dalton v. Kalispell Reg'l. Hosp.*, 256 Mont. 243, 247, 846 P.2d 960, 962 (1993)).

---

[5] When jurisdiction over an action is founded upon diversity of jurisdiction under 28 U.S.C. § 1332(a), federal courts apply the substantive law of the forum state. *Wilderness Dev., LLC v. Hash*, 606 F.Supp.2d 1275, 1279 (D. Mont. Mar. 9, 2009) (citing *Medical Lab. Mgmt. Consultants v. American Broadcasting Companies, Inc.*, 306 F.3d 806, 812 (9th Cir. 2002).

In order to establish a standard of care in Montana, the Montana Supreme Court has consistently held that expert testimony is required "in cases where professional duties may not be apparent to a layperson." *Not Afraid*, ¶ 16, citing *Dubiel v. Mont. DOT*, 2012 MT 35, ¶ 18, 364 Mont. 175, 272 P.3d 66 (holding that plaintiff was required to present expert testimony to establish the standard of care applicable to the Montana Department of Transportation's decision-making process for closing a road); *Dulaney v. State Farm Fire & Cas. Ins. Co.*, 2014 MT 127, ¶ 21, 375 Mont. 117, 324 P.3d 1211 (holding that plaintiff's failure to obtain an expert witness resulted in an "insufficiency of proof regarding [the] duty" of an insurance agent to advise his client on sufficient coverage); and *Dayberry v. City of E. Helena*, 2003 MT 321, ¶ 21, 318 Mont. 301, 80 P.3d 1218 (holding that expert testimony was required to determine whether the depth of a swimming pool was unreasonably dangerous for the diving board length in a case against a swimming pool operator).

In *Dubiel v. Mont. DOT*, 2012 MT 35, 364 Mont. 175, 272 P.3d 66, the plaintiff brought suit after her husband was killed by a falling tree while he was driving on the highway near Big Fork, Montana. *Id*. ¶ 3. Plaintiff's estate argued that the Montana Department of Transportation should have closed the highway due to high winds, and that the defendant's failure to do so constituted negligence. *Id*. ¶ 4. The plaintiff retained an economic expert to address her husband's economic losses, but did not retain an expert to establish the defendant's standard

of care regarding highway safety. *Id*. Following the expert disclosure deadline, the defendant moved for summary judgment arguing that the plaintiff could not prove her negligence claim because she had failed to identify an expert witness to testify regarding the defendant's standard of care. *Id*. ¶ 6. Plaintiff countered that "no specialized knowledge was required to understand the standard and determine that it had been breached." *Id*.

The District Court agreed and granted the defense motion, stating "[a]n unassisted lay juror could not identify the factors a highway maintenance official must consider when making the decision to close a road. The factors that go into closing a road or keeping it open are not obvious to lay persons, who are not versed in highway maintenance methods." *Id*. ¶ 7. The District Court went on to state that "because [the defendant's] policies on road closure do not define a particular standard of conduct, [the plaintiff] needed an expert witness to establish the [standard of care] and whether the standard had been breached on the morning of her husband's death. Because [the plaintiff] had no expert, she could not make out a prima facie case of negligence and [the defendant] was entitled to summary judgment." *Id*. ¶ 8.

On appeal, the Montana Supreme Court affirmed, stating, "expert testimony is required when the issue presented is sufficiently beyond the common experience of the trier of fact and the expert testimony will assist the trier of fact in determining the issue or understanding the evidence." *Id*. ¶ 17 (internal citations

omitted). The Court then clarified the basis for the expert testimony requirement:

> [T]here are numerous interrelated factors that must be considered by [the defendant] in making a decision to close a road, many of which are not readily apparent to a layman. These include [. . .] an understanding of the [defendant's] chain of command and the manner in which decisions are made in a dynamic situation which changes minute to minute. While [the defendant's] policies and procedures present some general guidelines, they are not sufficient, standing alone, to adequately inform a jury of [the defendant's] standard of care and whether it met that standard on the morning of [plaintiff's husband's death]. Therefore, [the plaintiff] was obligated to present expert testimony to assist the trier of fact in making the determination of whether [the defendant] was negligent.

*Id*. ¶ 18.

The above cases are instructive here because they set forth the basis, the understanding, and the rule that expert testimony is required to establish the standard or duty of care in cases like this one where the professional duties would not be apparent to a layperson or juror. Here, Cotton needed to identify and disclose an expert to testify about factors such as the adequacy (or alleged inadequacy) of BNSF's safety training; the adequacy (or alleged inadequacy) of, and standards relating to, BNSF's management of employees at the Great Falls Roundhouse; the appropriateness (or alleged inappropriateness) of the responsibilities delegated by BNSF to Cotton and his coworkers; the appropriateness (or alleged inappropriateness) of BNSF's investigation into Cotton's conduct; the application of the CBA in this matter; legal duties owed by BNSF to Cotton; the application of BNSF's progressive disciplinary process to

26

Cotton's misconduct; and BNSF's management (or alleged mismanagement) of Cotton's disciplinary assessment as a whole. None of these factors would or will be apparent to a layperson without expert testimony.

The deadline for all parties to disclose liability experts and for Cotton to disclose any damage expert was November 2, 2018. (ECF 21). Discovery in this case is closed. *Id*. On May 18, 2018, Cotton served his objection to Interrogatory No. 3 of BNSF's initial discovery requests – which sought the identification of any witness(es) that Cotton intended to call as an expert – as premature. SUF 40. The expert disclosure deadline has long passed, discovery is closed, and Cotton did not disclose any experts, did not supplement his discovery response, and has not provided expert testimony that BNSF committed negligent mismanagement.

With no expert(s) to provide the required testimony regarding any legal duty that may have been owed to him by BNSF or how any duty may have been breached by BNSF, Cotton cannot establish or controvert any of the above mentioned factors – factors that are beyond the scope and understanding of a layperson/juror and factors that are critical to his claims and allegations of negligent mismanagement. Like the plaintiff in *Dubiel* above, Cotton's failure to disclose any expert is fatal to his negligence claim, warranting summary judgment.

### 3. Cotton has no facts or evidence to support his negligent mismanagement claim or his request for punitive damages.

On April 13, 2018, BNSF served Cotton with its first set of discovery, which

27

included requests for admission, interrogatories, and requests for production. The discovery was served pursuant to the Joint Discovery Plan (ECF 15, April 10, 2018) and Rules 26, 33, and 34 of the Federal Rules of Civil Procedure.

BNSF requested information from Cotton that supported his allegations of negligent mismanagement:

> **INTERROGATORY NO. 5**: Describe in detail, stating each and every fact supporting the allegation of mismanagement pursuant to §39-2-703, MCA, including those acts described in Paragraph 31 (A)-(G), as alleged in your Complaint.

To which Cotton answered:

> **ANSWER**: Objection. Defendant's request calls for privileged attorney-client communications and for information protected by the attorney work-product doctrine all in violation of the *Federal Rules of Evidence and Rule 26(a)(5) F.R.Civ.P.*

Similarly, BNSF requested information from Cotton that would justify an award of punitive damages:

> **INTERROGATORY NO. 8**: Please state every fact which you claim justifies an award of punitive damages.

To which Cotton answered:

28

**ANSWER**:  Objection.  This request seeks to have Plaintiff marshal all evidence in response to a single interrogatory. Discovery is ongoing and not all information responsive to this interrogatory has been identified. Plaintiff reserves the right to supplement this response.

SUF 42. No Rule 26(b)(5), Fed.R.Civ.P., privilege log was ever provided by Cotton that would indicate what information or material, if any, was withheld. Discovery has now closed, and Cotton did not supplement his answers. Rather, Cotton stuck by his assertion that any fact that could possibly support his allegations or claims of negligent mismanagement is "privileged" or "protected" and not subject to disclosure (and thus not admissible) in this case.

With regard to Cotton's punitive damages claim, BNSF acknowledges that generally speaking, liability for punitive damages is determined by a trier of fact, pursuant to § 27-1-221, MCA. *See e.g.*, *Hagen v. Dow Chemical Co.*, 261 Mont. 487, 863 P.2d 413 (1993) (holding that a genuine factual issue existed on the issue of punitive damages); *Owens v. Parker Drilling Co.*, 207 Mont. 446, 676 P.2d 162 (1984) (holding that enough factual evidence had been provided by way of depositions and interrogatories to establish a genuine issue of material fact regarding punitive damages).

However, there are cases in which Courts have dismissed punitive damage claims as insufficient as a matter of law. *See O'Bagy v. First Interstate Bank of Missoula*, 241 Mont. 44, 46, 785 P.2d 190, 191 (1990). In *General Ins. Co. of*

*America v. Town Pump, Inc*., 214 Mont. 27, 34-35, 692 P.2d 427, 431 (1984), the

Montana Supreme Court upheld a District Court's summary judgment

determination that inadequate evidence had been provided to establish a basis for

punitive damages. The Court stated:

> Appellant has failed to carry its burden of proof here.  Town Pump
> has only made a bald assertion that General acted fraudulently and
> such does not raise a genuine issue of material fact.  Conclusive or
> speculative statements are insufficient to raise a genuine issue of
> material fact.

*Id*., (citing *Fauerso v. Maronick Const. Co.*, 661 P.2d 20, 40 St. Rep. 327 (Mont.

1983)).

Here, Cotton has stated that he does not have any non-privileged or

admissible facts to support his negligent mismanagement claim and has not

provided or produced any evidence whatsoever that BNSF's alleged misconduct

justifies punitive damages. He has failed to establish, and cannot carry, his burden

of proof here, warranting summary judgment on his claims.

## IV.   CONCLUSION

For the reasons set forth herein, BNSF respectfully requests that the Court

grant summary judgment in its favor and dismiss Cotton's claims with prejudice.

DATED this 15th day of March, 2019.

HEDGER FRIEND, P.L.L.C.

By: /s/ Jared C. B. Frickle
Attorney for BNSF Railway Company

## CERTIFICATE OF COMPLIANCE

Pursuant to D. Mont. Local Rule 7.1(d)(2)(E), I certify that this brief complies with the word limits set out in that rule. Excluding the caption, certificate of service and compliance, and based on the count provided by counsel's word processing system, this brief contains 5,901 words.

<u>March 15, 2019</u>                                        <u>/s/ Jared C. B. Frickle.</u>

## CERTIFICATE OF SERVICE

I, the undersigned, a representative of the law firm of Hedger Friend, P.L.L.C., hereby certify that I served a true and complete copy of the foregoing **"BNSF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT"** on the following persons by the following means:

<u>1, 2, 3</u>   CM/ECF
\_\_\_\_\_   Hand Delivery
\_\_\_\_\_   Mail
\_\_\_\_\_   Overnight Delivery Service
\_\_\_\_\_   Fax
\_\_\_\_\_   E-Mail

1.   Clerk, U.S. District Court

2.   David K. W. Wilson, Jr.
    Morrison Sherwood Wilson Deola, PLLP
    401 North Last Chance Gulch
    P.O. Box 557
    Helena, MT  59624

3.   Jeff R. Dingwall (CA #265432)
    EIGHT & SAND
    550 West B Street, Fourth Floor
    San Diego, CA 92101
    (619) 796-3464
    *Pro hac vice*

DATE:  <u>03/15/2019</u>                         <u>/s/ Jared C. B. Frickle   .</u>